# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                              CASE NO. 07-20215
                                           HON. LAWRENCE P. ZATKOFF

v.

CHRISTOPHER CERNIK,

       Defendant.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on July 24, 2008

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

On this date, Defendant Christopher Cernik appeared before the Court for purposes of being sentenced in conjunction with his guilty plea to Count 1 of the First Superseding Information filed against him on September 12, 2007. For the reasons set forth herein, the Court hereby imposes the following sentence, which the Court believes is a reasonable disposition for this Defendant. The Court orders that Defendant be placed on probation under the supervision of the United States Probation Department for a term of 60 months subject to all of the terms and conditions of probation as set forth in the Judgment and Commitment Order.

## II. BACKGROUND

**A.** **UNDERLYING CONDUCT**

On March 26, 2007, a detective from the Toledo Police Department, working with the Ohio Internet Crimes Against Children task force (ICAC), began chatting online while posing as a

thirteen-year-old girl named "Haley." Using the profile haleyconners13, the detective sent an instant message to an individual using the screen name ccrider150@sbcglobal.net (ccrider150). Ccrider150 responded to the detective, identified himself as Chris, and stated that he resided in Michigan. Chris, later identified as Defendant, described himself as a 32 year-old male, approximately 5'10", 230 pounds, with short, brown hair and dimples. In response, the detective described "Haley" as thirteen years old, 5'4", 104 pounds, with brown hair and brown eyes.

Between March 26, 2007, and April 10, 2007, the detective conducted several online chats with Defendant. The conversations began innocently but quickly escalated to sexual topics. Specifically, Defendant began inquiring about "Haley's" former boyfriend and the reason for their break-up. "Haley" explained that the boyfriend left her because she was waiting to have sex with the right person when she was ready. Defendant replied "maybe me down the road." Defendant stated that he was looking for a "girlfriend to marry or live together and also make babies too."

In a separate conversation, Defendant commented on "Haley" wearing a "hott bikini" and later stated that he was going to "do some yard work ...... but I am going to nap masturbate ... lol... then get my hair cut and maybe wash my truck." Defendant expressed his desire to "hang out" and "cuddle" with "Haley" as well. In a later chat, Defendant told "Haley" that he wanted to be her "boyfriend" and asked her about past sexual experiences. Defendant eventually informed "Haley" that he did not have any children but was "waiting for u when ur ready."

On April 9, 2007, "Haley" stated that she would be in Livonia, Michigan, to visit her grandparents in the near future. The following conversation ensued:

haleyconnors13: where do u live again?

ccrider150: westland about 5 mins from livionia

haleyconnors13: no way

2

> haleyconnors13: i wish you lived in livonia!
>
> ccrider150: well i can drive it
>
> haleyconnors13: u wud visit me?
>
> ccrider150: where do they live
>
> haleyconnors13: I don't know the exact address but its near rotary park

Defendant then asked "Haley" if she would "wanna have intercourse." When confronted with the fact that "Haley" was thirteen-years-old, Defendant stated that he did not care "as long as u don't care I am older than u and that u don't tell anyone." After further discussing sex, "Haley" asked if Defendant knew where Rotary Park was. Defendant indicated that he did and then went on to ask "Haley" if he could ejaculate inside her. Thereafter, the two made plans to meet at Rotary Park.

On April 11, 2007, at Rotary Park in Livonia, Michigan, Defendant was arrested as he approached an agent posing as "Haley." The arresting agents transported Defendant to the Detroit Field Office of the United States Secret Service where he was interviewed. Defendant admitted that he went to Rotary Park to meet "Haley," a thirteen-year-old girl from Ohio. Defendant stated that his intent was not to harm or hurt "Haley" in any way. In his written statement that begins "Hello, I am Chris," Defendant explained that his purpose was to "form a relationship [with 'Haley'], getting to know each other, hang out, be friends and later on have sex, relationship, settle down to be a family and have kids down the line if possible."

As a result of the foregoing, the United States of America (the Government) filed an Indictment on April 20, 2007, charging Defendant with one count of Coercion and Enticement of a Minor in violation of 18 U.S.C. § 2422(b). The Government later filed a First Superseding Information on September 12, 2007, charging Defendant as follows: (1) Count 1 charged Defendant with Coercion and Enticement in violation of 18 U.S.C. § 2422(a); and (2) Count 2 charged

Defendant with Coercion and Enticement of a Minor in violation of 18 U.S.C. § 2422(b). On September 25, 2007, Defendant appeared before the Court and, based on a Rule 11 plea agreement, tendered a plea of guilty to Count 1 of the First Superseding Information.

**B.  DEFENDANT**

Defendant is a 33 year-old man who lives in Westland, Michigan, with his mother and younger brother. He has no prior contact with the criminal justice system. Although he was referred to special education in 1981, Defendant graduated from high school in 1993. After graduating, Defendant enrolled at Henry Ford Community College on a golf scholarship but was forced to leave school when the scholarship money ran out and he could no longer afford to pay tuition. Defendant then began working for Del Ray Casting in Melvindale, Michigan, as a full-time crane and furnace operator. However, in 1999 Defendant was severely burned during a foundry fire, from which significant scars still remain. Defendant eventually left Del Ray and worked for a painting company from 2000 to 2001. From June 2001 through June 2003, Defendant attended welding classes at the William D. Ford Technical Center in Westland, Michigan, but eventually dropped out. Since 2001 Defendant has worked for a landscaping company in Belleville, Michigan. Defendant also maintained employment with a locksmith in Livonia, Michigan, from 2001 to 2004.

Defendant has never been married and has no children. Defendant has lived his entire life in his mother's home in Westland, Michigan. Defendant's parents divorced when he was in high school and he subsequently became estranged from his father after he learned of his father's extramarital affair. Defendant's father also had a history of alcohol abuse, and would often times become verbally abusive. Defendant still maintains a close relationship with his mother, who is employed as a nurse at Oakwood Hospital in Dearborn, Michigan.

Defendant has been participating in mental health treatment since April 25, 2007. According

to the therapist, Defendant has accepted full responsibility for the offense, has displayed genuine empathy toward victims, and has made good progress. In addition, Defendant was evaluated by Dr. Steven Miller, Ph.D., L.P., on July 30, 2007. Defendant had no history of mental health treatment; however, Defendant experienced depression due to the loneliness he felt from not being in a serious relationship. Dr. Miller found that Defendant displayed positive signs of Bipolar disorder and suffered from mild cognitive and perceptual deficits. Defendant also showed signs of sexual addiction, such as equating sex with love and frequent use of pornography. Defendant accepted responsibility for his actions and denied any strong sexual interest in underage females. Dr. Miller found no signs that Defendant was a pedophile or a sexual predator. Defendant expressed a strong interest in continuing psychotherapy.

Based on his examination, Dr. Miller opined that Defendant "is readily and safely treatable within a community setting and that he has a very low risk for recidivism or for violent acting out." Dr. Miller also concluded that with continued treatment, Defendant's mental condition could be "effectively managed." Finally, Dr. Miller recommended that Defendant "continue to participate in individual psychological counseling" and that he immediately enroll in Sex Offender Treatment, Relapse Prevention group therapy and in Sexual Addictions Anonymous.

### III. PRE-SENTENCE REPORT AND GUIDELINES CALCULATIONS

By statute, Defendant may be sentenced to a term of imprisonment of up to 20 years for Count 1, along with a fine of up to $250,000. The Court has reviewed the Presentence Investigation Report (PSR) in this case and notes the following computations set forth therein. Defendant has a base offense level of 24 for the violation of the provisions of 18 U.S.C. § 2422(a). In addition to the base offense level, two adjustments have been proposed in calculating the total offense level:

(1) A two-level enhancement pursuant to § 2G1.3(b)(3)(B) because "the offense

5

involved the use of a computer to entice encourage, offer or solicit a person to engage in prohibited sexual conduct"; and

(2) A three-level reduction pursuant to § 3E1.1(a)-(b) because Defendant has accepted responsibility for this offense.

As a result of the foregoing adjustments, the proposed total offense level for Defendant is 23.

Since Defendant has no prior criminal convictions, he has zero criminal history points and his classification is a Criminal History Category I. The advisory Guidelines range pursuant to the calculations set forth above is 46 to 57 months. Neither Defendant nor the Government filed any objections to the PSR. Accordingly, the Court adopts the proposed adjustments and agrees that the advisory Guidelines range for Defendant is 46 to 57 months.

## IV. SENTENCING MEMORANDA

Defendant filed a sentencing letter on January 9, 2008, requesting that the Court sentence him to the bottom of the advisory Guidelines range, *i.e.* 46 months in prison. Defendant cites the lack of criminal history, the fact that he has readily accepted responsibility for the offense, and that he has "faithfully complied with all the conditions of his bond," including regular attendance of psychological treatments provided through Catholic Social Services. In addition, Defendant provided a Forensic Psychological Evaluation prepared by Dr. Steven Miller, Ph.D., L.P., following an examination of Defendant on July 30, 2007.

The Government did not submit any Sentencing Memoranda.

## V. SENTENCING HEARING

The sentencing hearing for this case was originally scheduled for April 10, 2008. On that date, however, the Court conferred with counsel for Defendant and the Government, and also discussed this matter with the Probation Officer assigned to this case. The Court informed counsel

for Defendant and the Government that it had thoroughly considered the relevant Guideline provisions, the evidence presented, the PSR, and the Forensic Psychological Evaluation, and stated its reservations concerning the advisory Guidelines range for Defendant. In order for both counsel to fully address the possibility of a below-Guidelines sentence, the Court rescheduled the sentencing hearing for April 29, 2008. The hearing was again reset for May 13, 2008 and again for July 24, 2008.

On July 24, 2008, the Court conducted the sentencing hearing. Prior to rendering Defendant's sentence, the Court heard and considered arguments from both counsel for Defendant and the Government regarding the appropriate sentence for Defendant. The Court also presented counsel with a proposed sentencing memorandum, which was marked as Exhibit A for purposes of the hearing, and solicited comments and objections not previously stated on the record.

## VI. ANALYSIS

The overarching goal of the federal sentencing statute instructs the Court to "impose a sentence sufficient, *but not greater than necessary* to accomplish the goals of sentencing ...." *Kimbrough v. United States*, 552 U.S. ___, 128 S. Ct. 558, 570 (2007) (emphasis added) (internal quotation marks omitted).

The Court has thoroughly reviewed the file of Defendant, paying particular attention to the PSR, the sentencing letter filed by Defendant, and the statements of Government counsel, counsel for Defendant and Defendant himself. The Court has given considerable attention to the findings and opinions of Dr. Miller, who personally evaluated Defendant, and whose conclusions shall be discussed *infra*. As noted above, the crime to which Defendant has pled guilty carries a prison term of up to 20 years, and the applicable advisory Guidelines range for Defendant is 46 to 57 months. While the Court strongly detests the crime to which Defendant pled guilty, for the reasons set forth

7

herein, the Court does not believe a sentence of imprisonment within the advisory Guidelines range is appropriate in this case.

**A. THE ADVISORY SENTENCING GUIDELINES**

The Court emphasizes that it has consulted the advisory Guidelines and has taken them into account in sentencing Defendant; in fact the Court, as it must, initiated its assessment of an appropriate and reasonable sentence for Defendant with the advisory Guidelines. *See Gall v. United States*, 552 U.S. ___, 128 S. Ct. 586, 596 (2007). The Court recognizes that advisory Guidelines ranges do not consist of an arbitrary set of numbers, but rather exist as the result of recommendations by an expert commission that studied the sentencing process at great length. Further, the Court has, in this case as in any other case, given heavy weight to the advisory Guidelines in determining an appropriate and reasonable sentence for this Defendant. But the advisory Guidelines are not the Court's only consideration, and the Court may not presume that the advisory Guidelines range is reasonable. *See id.* at 596-97. Rather, the Court must consider all of the factors in 18 U.S.C. § 3553(a) and must "make an individualized assessment based on the facts presented." *Id.*; *see also Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue."). In an appropriate case, the Court "may determine ... that a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 552 U.S. ___, 128 S. Ct. at 564.

The Court varies from the advisory Guidelines in this case because it involves unusual circumstances that dictate such a variance, and because a number of factors in 18 U.S.C. § 3553(a) weigh in favor of a sentence other than imprisonment. In doing so, the Court is mindful of the need

8

to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6) (stating the court "shall consider – the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct"). For the reasons set forth below, the Court finds that a variance is warranted in this case.

**B. SECTION 3553(a)(1)**

Section 3553(a)(1) instructs that the Court is to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"

*1. The Nature and Circumstances of the Offense*

The nature and circumstances of the offense to which Defendant has pled guilty are serious. Through the use of a computer, Defendant engaged in sexually explicit conversations with a person he believed to be a thirteen-year-old girl. These conversations contained graphic passages in which Defendant expressed his desire to engage in numerous sexual acts with the girl. Eventually, Defendant arranged to meet the girl in person and hoped to begin a sexual relationship. Ordinarily, this type of conduct would merit a severe penalty.

The Court notes, however, that the detective posing as "Haley" initially suggested meeting with Defendant. Prior to this suggestion, Defendant had not made any overt attempts to actually meet with "Haley." The mention of this fact should not be construed as the Court condoning Defendant's behavior or excusing his actions. However, in light of Defendant's characteristics and history, the Court finds the fact that Defendant did not initiate the meeting significant in evaluating the nature and circumstances of the offending conduct in this case.

*2. The History and Characteristics of the Defendant*

Defendant has maintained continuous employment since graduating high school in 1993. Consistent with this history, Defendant has exhibited personal responsibility by admitting his guilt

and pleading guilty to the instant offense. Moreover, Defendant has voluntarily engaged in mental health counseling in order to correct the cognitive deficiencies that contributed to his behavior. Finally, Defendant has a solid support structure in his family and plans to live with his mother, with whom he maintains a close relationship, upon completion of any sentence.

The Court had the opportunity to observe Defendant and hear his comments on several occasions. On each of those occasions, Defendant was forthcoming, honest, and appeared genuinely remorseful for his actions. Based on these observances the Court is of the belief that Defendant is a naive and immature individual. The Court is not alone in these observations. The PSR, which was prepared by a highly qualified and experienced Probation Officer who has personally dealt with hundreds of defendants, indicates that Defendant "is unable to relate to individuals his own age and is 'stuck' with the attitude and maturity of a teenager." This is also evident in his online conversations with the detective, in which, in addition to discussing sexual topics, he expressed a desire to form a normal relationship with "Haley" and have children with her.

What is more, Defendant's psychological evaluation confirms that he is incapable of properly interpreting social and sexual stimuli. Specifically, Defendant's perception of the proper relationships between adults and children is distorted. Dr. Miller explained that

> the best way to conceptualize the "cause" of this man's present legal predicament is to keep in mind that he has very likely developed the judgment and [sexual] behavior difficulties manifested in his life and indicative of his particular legal situation as a ... direct consequence of his chronically distorted processing of information in an atypical manner.

Based on his evaluation of Defendant, Dr. Miller concluded that Defendant is not a sexual predator and displays no signs of any sexually deviant disorders such as Pedophilia. Significantly, Dr. Miller concluded that Defendant poses little risk of re-offending. Defendant's lack of criminal history lends credence to the view that Defendant's conduct was more attributable to his level of cognitive

10

maturity than to the presence of sexual deviancy.

Finally, Defendant's written statement prepared on the day of the arrest is particularly troubling. At the time of the arrest Defendant was 32 years old, yet his written statement begins "Hello, I am Chris." Defendant goes on to explain that his intent in talking with and meeting "Haley" was to "form a relationship, getting to know each other[,] hang out, be friends, and later on have sex, relationship, settle to be a family and have kids down the line if possible." In the Court's extensive experience with criminal defendants, including cases similar to the present one, this type of social and cognitive immaturity is atypical, and leads the Court to believe that Defendant is distinguishable from defendants who have been found guilty of similar conduct.

## C. SECTION 3553(a)(2)(A)

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed – to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]" In this case, the Court believes that a term of imprisonment of 46 to 57 months would not accomplish any of those objectives.

The Court acknowledges that the offense in this case is serious. Nevertheless, the Court finds that this is not a typical case. As stated previously, the Court finds Defendant's mental and social capacity to be atypical of defendants convicted of similar conduct. In contrast to the typical defendant, Defendant was not motivated by a perverse desire for sexual gratification but by his inability to interact socially with his cohorts and perceive the appropriate type of relationship between an adult and a minor. In other words, the Court agrees with Dr. Miller and the PSR that Defendant was "stuck with the attitude and maturity of a teenager." Consequently, a term of 46 to 57 months is greater than necessary to reflect the seriousness of the offense in this case.

The Court also finds that this sentence promotes respect for the law in this case at least as

much as a term of imprisonment would. Defendant has accepted full responsibility for his actions, and has voluntarily participated in mental health counseling in the year since his arrest. In addition, on the occasions Defendant has appeared before the Court, he has been genuinely remorseful. Defendant's therapist has likewise concluded that Defendant expresses genuine empathy to victims of crimes like his. Accordingly, a significant term of imprisonment for this Defendant is not necessary to promote respect for the law.

While the Court recognizes that "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," *Gall*, 552 U.S. ___, 128 S. Ct. at 595, Defendant's sentence in this case will substantially restrict his liberty. As the Supreme Court noted in *Gall*,

> [p]robationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id.* at 595-96. Like the Defendant in *Gall*, Defendant's liberty will be similarly restricted. Defendant will be required to comply with the standard conditions of probation or face incarceration. In addition, Defendant's freedom of movement will be constrained. Moreover, Defendant must register as a sex offender in the community where he lives and works. Thus, Defendant's sentence in this case should not be interpreted as leniency. Based on its judgement of the unique facts and circumstances in this case, the Court finds this sentence provides just punishment for this offense.

**D. SECTIONS 3553(a)(2)(C) and (D)**

Sections 3553(a)(2)(C) and (D) provide that the Court must consider "the need for the sentence imposed – to protect the public from further crimes of the defendant; and to provide defendant with needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner[.]" In this case, the Court finds that a lengthy term of imprisonment will not facilitate either of these factors any more than a short, or even no, term of imprisonment would.

As referenced above, the Court relies heavily on the opinions of Defendant's mental health therapist and Dr. Miller, who personally evaluated Defendant. Within two weeks of his arrest in April 2007, Defendant began treating with Catholic Social Services and has continued to attend weekly individual sessions. During that time, Defendant accepted full responsibility for his offense and expressed genuine empathy toward victims. Through these sessions, Defendant has altered his past distorted thinking and has learned to identify the risk factors that led him to engage in the offending conduct.

On July 30, 2007, Dr. Steven Miller conducted a Forensic Psychological Evaluation of Defendant. In the evaluation, which lasted approximately three hours, Dr. Miller sought to answer the following three questions: (1) whether Defendant suffers from a sexual paraphilia or any other sexually compulsive/addictive disorder; (2) whether Defendant is a sexual predator of minors; and (3) whether Defendant requires psychological treatment and, if so, whether such treatment can be safely administered in a community setting. In order to answer these questions, Dr. Miller gathered information on Defendant's social and psychological history, conducted a battery of psychological tests, administered sex-offender risk assessment instruments, conducted a formal mental status examination, conducted a structured diagnostic interview designed to diagnose possible sexual deviancy, and reviewed Defendant's criminal case file.

Defendant's mental health history showed no background of psychiatric or psychological treatment, but he displayed psychological distress when the examination focused on his current legal situation. Defendant reported that he abused alcohol in the past and experienced episodes of

depression accompanied by restlessness, feelings of regret and shame, tension, and loss of self-control. Defendant believed his depression was related to his feelings of loneliness. Furthermore, Defendant had been prematurely exposed to sex; on one occasion he was severely reprimanded for viewing an adult-magazine, which Defendant believed to have a negative impact on his overall sexual and emotional adjustment. Dr. Miller found that Defendant displayed positive signs of Bipolar disorder and suffered from mild cognitive and perceptual deficits, including great difficulty with sexual and social interactions. Such persons have severe deficits in terms of interpreting social stimuli, making sex a source of confusion and preoccupation.

Defendant also suffers from a sexual addiction type of sexual disorder. Defendant reported numerous behaviors linked to sexual addiction, such as thinking sex is love, cognitive distortions of human sexuality, periods of loneliness, compulsive masturbation, and frequent viewing of pornography. Defendant also displayed a moderate degree of cognitive distortions relative to the behavior of adult offenders toward children and adult females. Several of his responses showed significantly naive notions regarding the typical sexual behaviors of children. However, Defendant denied participating in other deviant sexual behaviors and specifically denied having a strong sexual interest in underage females. Dr. Miller believed that these cognitive deficits could successfully be treated through therapy. Finally, Defendant's results on the Vermont Assessment of Sex-Offender Risk placed him in the low range for risk of recidivism and risk of violence, indicating that he can be safely treated in a community setting.

As a result of the evaluation, Dr. Miller diagnosed Defendant with Bipolar II Disorder and moderately severe Sexual Addiction Disorder. Dr. Miller did not find that Defendant displayed any grossly pathological personality features such as Pedophilia. Rather, Dr. Miller concluded that Defendant's behavior was more likely the result of his sexual addiction when combined with his

Bipolar disorder and cognitive deficiencies than any sexual deviancy.

Dr. Miller concluded that (1) Defendant does not suffer from any sexual paraphilia; (2) Defendant had no history of predatory behavior toward children; and (3) Defendant could safely and successfully be treated for his disorders in a community setting. Finally, Dr. Miller recommended that Defendant be placed under court supervision, continue his present course of psychological counseling, undergo periodic evaluations for his Bipolar disorder, and enroll in Sex-Offender Therapy, Relapse Prevention Therapy, and Sexual Addictions Anonymous. He explained that

> psychotherapy for Mr. Cernik is most likely to be helpful to him when it is presented to him in a learning/educational format in order for him to learn how to form a stable relationship and how to develop an understanding of the standard assumptions, expectations, and values of others, something that he is, essentially, unable to do for himself.

On the basis of the PSR, and the evaluations of Defendant's therapist and Dr. Miller, the Court believes that the key to (a) ensuring that the public is protected from further crimes of Defendant and (b) providing Defendant "with needed education ... [and] correctional treatment in the most effective manner" would be continued therapy and treatment such that he is able to correct the cognitive and emotional deficits that led him to engage in the offending conduct.

Having had the opportunity to observe Defendant on multiple occasions, and consistent with Dr. Miller's finding that therapy will be most effective in an educational environment, the Court believes that an extended prison sentence will not benefit Defendant or the public, and will likely result in negative behavioral acts. As the Supreme Court observed in *Gall*, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. ___, 128 S. Ct. at 599. Defendant currently presents a low risk to society, is safely treatable in an outpatient setting, and has already shown great

improvements through therapy. If Defendant's therapy were to end, however, and were he to be exposed to the debilitating conditions in prison life, the Court believes he would pose more of a risk to society after a term of incarceration than he does now. The Court sees no purpose in sentencing this Defendant to a term of imprisonment.

For the foregoing reasons, the Court concludes that continued psychological therapy, mandatory counseling with a registered sex offender therapist, and participation in relapse prevention therapy and Sexual Addictions Anonymous will be far more effective in achieving the objectives of §§ 3553(a)(2)(C) and (D) than would an extended term of imprisonment under the advisory Guidelines range.

## VII.  CONCLUSION

For the reasons set forth above, it is HEREBY ORDERED that Defendant shall be placed on probation under the Supervision of the United States Probation Department for a term of 60 months subject to all of the terms and conditions of probation as set forth in the Judgment and Commitment Order.

IT IS SO ORDERED.

Date: July 25, 2008

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE